Filed 5/15/24  In re K.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re K.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E082588 |
| Plaintiff and Respondent, | (Super.Ct.No. J285625) |
| v. | OPINION |
| K.J., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Charles J. Umeda, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

The juvenile court granted plaintiff and respondent, the People's, second Welfare and Institutions Code[1] section 707 motion to transfer defendant and appellant, K.J. (minor), from the jurisdiction of the juvenile court to that of the criminal court. Minor contends the juvenile court abused its discretion in granting the motion. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

On April 8, 2020, two suspects entered a smoke shop and robbed the victim of his possessions. One of the suspects held a handgun, which he pointed at the victim, while the suspects robbed him. From surveillance video of the robbery obtained later, an officer testified he recognized the unarmed individual as minor. The officer opined that minor, a California Garden Crips (CGC) gang member, committed the robbery to benefit CGC.

On June 13, 2020, a 2001 to 2003, dark, blue Maxima stopped in front of a residence in the territory of Delmann Heights Bloods (DHB), CGC's rival gang; witnesses

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] On the court's own motion, we take judicial notice of the record in minor's previous appeal from the juvenile court's grant of the People's original motion to transfer the matter to criminal court (*In re K.J.* (Jan. 25, 2023, E079207) [nonpub. opn.] (*K.J.*)), which both parties cite at length in their briefs. (Evid. Code, §§ 452, 459.) The parties below stipulated that the court could admit into evidence "the court reporter's record or transcripts of the last hearing," which it did. The court below also took judicial notice of its file in the case.

As the juvenile court noted at a transfer hearing, it is assumed that the minor committed the charged offenses. (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 682 ["[T]he criteria used to determine fitness are based on the premise that the minor did, in fact, commit the offense."]; accord, *Rene C. v. Superior Court* (2006) 138 Cal.App.4th 1, 10.)

2

observed pistols issue from the driver's side vehicle and sunroof. They then saw "a barrage of gunfire and muzzle flashes coming from the pistols."

Sixteen-year-old K.E. heard the gunshots and fell to the ground. She "suffered a gunshot wound to the right upper leg which severed her femur." Her cousin, 14-year-old E.M., suffered a gunshot wound to the head and died.

An officer "conducted a walk-through of the crime scene . . . ." He located three, .40-caliber and five, .45-caliber fired cartridge casings on the street in front of the residence. "The fired cartridge casings and [a] fired bullet were collected and placed into evidence . . . ."

On June 16, 2020, three individuals, including minor, "were arrested [after] fleeing law enforcement . . . after tagging in [a] park." During the arrest, an officer observed minor "holding a silver semiautomatic handgun in his right hand." "The firearm was collected and determined to be a Springfield XD .40 caliber semiautomatic handgun." One of the individuals arrested with minor was found within three feet of "a Ruger .45 caliber[] . . . handgun." Officers also found a third gun.

Officers located a blue, Nissan Maxima parked near where they arrested minor. An officer searched the vehicle and observed three .40-caliber and two .45-caliber fired cartridge casings. "All the fired cartridge casings were collected and booked into evidence." Officials released minor from custody shortly thereafter, while they were still investigating the homicide.

On June 18, 2020, the People filed a Welfare and Institutions Code section 602, subdivision (a) juvenile wardship petition with respect to the tagging incident, alleging

3

that minor committed possession of a firearm by a minor (Pen. Code, § 29610, count 1), participation in a criminal street gang (Pen. Code, § 186.22, subd. (a), count 2), and two counts of carrying a concealed weapon (Pen. Code, § 25400, subd. (a)(2), counts 3 and 4). On July 31, 2020, minor admitted the count 1 allegation. The court declared minor a ward of the court, dismissed the remaining counts, and released minor to his mother on various terms and conditions. (*K.J.*, *supra*, E079207.)

On August 24, 2020, someone observed minor placing a handgun in his pocket. An officer contacted minor at a jewelry store where minor removed the gun and placed it on the counter. The weapon was a P80 with no serial number. The officer found two .40-caliber rounds in the magazine.

On August 27, 2020, the People filed a subsequent petition as to the latter incident, alleging that minor committed possession of a firearm by a minor (Pen. Code, § 29610, count 1) and carrying a loaded firearm (Pen. Code, § 25850, subd. (a), count 2). Minor admitted the count 1 allegation; the court dismissed the count 2 allegation on the People's motion. (*K.J.*, *supra*, E079207.)

On September 30, 2020, the day set for the contested dispositional hearing on the subsequent petition, the People filed a second subsequent petition as to the robbery incident, alleging that minor committed second degree robbery (Pen. Code, § 211, count 1). Pursuant to Welfare and Institutions Code section 707, subdivision (a)(1), the People requested a transfer hearing to determine whether minor should be transferred to a court of criminal jurisdiction. (*K.J.*, *supra*, E079207.)

4

Further investigation of the homicide revealed the following: An officer "test-fired the Springfield XD-40 and the Ruger .45 caliber handguns[]" collected at the time of minor's arrest for vandalism.

An expert subsequently determined that the .45-caliber fired cartridge casings found at the site of the homicide were fired from the Ruger pistol; she also determined that the .40-caliber fired cartridge casings found at the homicide scene were fired from the Springfield Armory Model XD-40 semiautomatic pistol. One of the homicide witnesses was shown a photograph of the Nissan Maxima searched at the time officers arrested minor for vandalism; the witness positively identified the vehicle as the one involved in the shooting.

A search of the phone seized from one of the individuals arrested with minor contained photographs reflecting the third arrested suspect holding a Ruger semiautomatic handgun. That individual threw up CGC gang signs in the photographs. Call detail records reflected the phone was in the area at the time of the fatal shooting.

In Facebook messages, one of the individuals arrested with minor repeatedly used CGC gang terminology. There were photographs of him making gang signs and using gang indicia. One picture depicted minor and he making gang signs while minor had a handgun in his pocket. In others, minor was throwing CGC gang signs in rival gang territory two days after the murder.

Minor's Instagram account was under the name "Crip killer, which is often used in gang language by Blood gang members." During jail calls, minor "would ask his sister to go onto his account to communicate with other members of the gang to ask questions

5

about subjects who were also incarcerated who may have been involved in the street gang . . . and to get information about the gang."

A photograph on minor's account showed a handgun sticking out of his right front pocket. Another post the day before the homicide, had text reading, "'I got a XD-40.'" Another picture showed minor with the XD-40 that was located when he was arrested. "There were several photographs . . . or short videos . . . [reflecting him] in possession of the same Springfield XD-40." In the expert's opinion, the firearm in the pictures and the one recovered at the time of minor's arrest were the same.

Minor referred to members of a rival gang in derogatory slang. Due to his initial release, someone accused him of being a snitch. He was upset by the accusation. Minor responded that he was released because the police simply did not have enough evidence to convict him.

Someone posted that minor could not truly beat a murder charge if he was not the one responsible for it. Minor responded, "They don't know it was me. The case is still open for investigation.'" Two months after the homicide, minor earned a new moniker, "'Grimmy Rat,'" due to his commission of violent crimes.

A probation officer testified at the prior hearing that one of minor's social media posts reflected minor "needing to get a gun because he had a problem at a motel w[h]ere there were some Blood gang members. And they talk about going to commit robberies or crimes to get money to buy guns." Minor wrote, "'I can get blowers.'" One post reflected that minor talked "about selling a gun and then bought another one."

On June 15, 2021, the People filed a third subsequent petition alleging that minor committed murder (Pen. Code, § 187, subd. (a), count 1) and attempted murder (Pen. Code, §§ 664, 187, subd. (a), count 2). (*K.J.*, *supra*, E079207.)

On February 22, 25, March 10, 18, April 14, 29, and May 20, 2022, the juvenile court held the initial contested transfer hearing. On May 25, 2022, in an eight-page ruling, the court granted the People's motion to transfer minor to the criminal court. (*K.J.*, *supra*, E079207.)

Minor appealed. On January 25, 2023, this court conditionally reversed the juvenile court's order. We remanded the matter with directions to hold a new transfer hearing under section 707, as amended by Assembly Bill No. 2361 (2021-2022 Reg. Sess. (Assem. Bill 2361), which retroactively raised the People's burden on the transfer motion from a preponderance of the evidence to clear and convincing evidence. (*K.J.*, *supra*, E079207.)

On September 8, 11, 26, and 27, 2023, the court held a second transfer hearing on remand from this court. A detective for the San Bernardino Police Department opined that minor was more criminally sophisticated than the average youth. This was because he was connected to a large criminal network, was committing crimes for the purpose of obtaining money to buy guns, would attempt to set up robberies online, and engaged in criminal acts to ensure his gang was not shamed.

An expert CGC gang witness testified CGC is a criminal street gang, which engaged in criminal activity such as "[n]arcotic sales, illegal weapons possessions, assaults, robberies, [and] murders." "[T]here's an ongoing war between California

7

Gardens and [DHB] . . . that's where the victim was murdered and killed." Both individuals arrested with minor after the tagging incident were members of CGC. The expert opined minor was a member of CGC based on minor's associates, correspondences, display of gang signs, disputes with rivals, and activity in CGC territory.

Minor's probation officer testified that approximately three weeks after minor was assigned to his caseload, officers arrested minor with a gun. The probation officer wrote a section 707 transfer report after the People first requested minor's transfer; he found minor not suitable for transfer under prongs one through three of five criteria mandatory for consideration, but suitable under prongs four and five. "I believe at the time it wasn't a mistake. At that time[,] he had not yet committed a murder, and given those specific charges, it was reasonable to say he could possibly be rehabilitated."

After the initial transfer hearing at which minor was found unsuitable for juvenile court jurisdiction, "minor . . . was well aware of what could be done to benefit his case." However, his behavior showed an inability to follow his program and follow rules.

On February 27, 2023, minor "was being disrespectful to staff and told one of them to, 'Shut the fuck up.' He was counselled multiple times." Minor engaged in multiple incidents while in custody where he was disrespectful and refused to obey orders. In one incident minor "was redirected to return to his room but refused to follow staff directives and began . . . being disrespectful, stating, 'shut up.' 'I'll slap the shit out of you.' And where he stated, 'I got juvenile court. I'm not going to adult.'"

Minor had drawn "several pictures of a gun, I believe, a bullet coming out." He wrote messages "indicating Delmann Heights Bloods killer." Minor had a list of different firearms in his notebook.

On September 9, 2023, minor was involved in a "Code Red," "an incident where other officers are supposed to respond . . . because a fight might break out . . . ." Minor, as the aggressor, had "balled [up] his fist" and "was having a verbal altercation with the other youth who is a known [DHB] gang member." "[A]nother youth was holding [minor] back." "I feel like anyone who would want to be rehabilitated or didn't want to be part of the life would not engage with that type of activity with a rival gang member."

On September 11, 2023, minor was involved in a physical altercation with one of his peers. On September 15, 2023, minor was involved in another Code Red, where, unprovoked, he assaulted one of his peers and was deemed the initial aggressor. On the same date, he told a staff member he was going to fight another youth on the unit. On September 17, 2023, minor "threatened staff by stating 'they will be sorry' and he also referred to staff as 'dumb asses.'" On September 24, 2023, minor told staff "'if you come in here, you'll be taking it with blood on your hands, and you'll get to take it with blood.'"

A week prior to the probation officer's testimony, after a member of DHB was placed in minor's unit, minor requested they move the DHB member out of his unit; minor refused an offer to transfer out himself.

Minor participated in, and even completed, multiple training and rehabilitative programs, yet continued to engage in poor behavior.[3]  "He's not utilizing the skills that he's been taught in the courses."

The probation officer noted of minor's behavior since the last hearing, "It almost shows me [a] lack of remorse."  "At th[is] point, he shouldn't still be doing things like that.  Still associating himself with [the] gang, drawings, and stuff like that  [which] just shows there is a complete lack of remorse and . . . ability to rehabilitate with all the time that has passed and all the things he knew he shouldn't be doing."

The probation officer opined that minor's crimes and gang involvement made him criminally sophisticated.  Minor was not amenable to treatment in the juvenile court system.

Another probation officer testified that although minor was participating in programs, "he's not utilizing those coping skills on the unit and he continues to threaten staff."  "So if he's not taking these classes seriously and not showing us what he's capable of, as far as being proactive with his own rehabilitation, it's an indication to me that he's not go[ing] [to] be able to be amenable for the services that we provide . . . ."

The probation officer addressed all five factors requisite for the juvenile court to consider when ruling on a section 707 transfer motion.  Of the first, she noted that "the crime that [minor] is alleged to have committed is heinous and it is very well thought out."

---

[3]  Minor had also been terminated from several programs due to arrests, aggression, and behavioral issues.

"The second is his criminal history. So he was placed on probation back in 2020 for a possession of a firearm by a minor. He . . . did about 40[] days in custody for that offense before he was declared a ward. Then he was released and a couple weeks later was found in possession of another firearm and then committed a robbery and then, unfortunately, this murder." She determined that minor's criminal history was sophisticated.

Moreover, minor continued to engage in defiant and aggressive behavior affecting their ability to provide him rehabilitative treatment. Minor showed "a lack of remorse"; "he's not apologetic." "Tagging, continue[d] tagging, the drawing of the gun with . . . ammo coming out of it." "I think that's just him showing that he has no remorse for this matter."

"So in totality I found that [minor] is not suitable . . . because of the severity of the offense, his criminal history, his current behavior and his age. . . ." There was insufficient time to rehabilitate him in juvenile court programs. She "found even though the youth is legally eligible, he's unsuitable" for juvenile programs. Minor was "unsuitable because of the violence and the nature of this crime."

On October 27, 2023, the court exposited the reasons for its ruling. The court noted that the People bore the burden of proving by clear and convincing evidence that minor was "not amenable to rehabilitation while under the jurisdiction of the juvenile court." The court rendered a statement of facts.

The court went through the five criteria to consider when determining whether to transfer a juvenile to a court of criminal jurisdiction. The court then conducted its

11

analysis.  The court found that four factors weighed against minor's amenability to juvenile court jurisdiction and a fifth factor was neutral.

Thus, the juvenile court found "that the People have met their burden of proof to show that [minor] is not amenable to rehabilitation under the jurisdiction of the juvenile court.  [¶]  The Court at this time will set this matter for arraignment in adult court."

## II.  DISCUSSION

Minor contends "the juvenile court's findings are not supported by substantial evidence and constitute an abuse of discretion."  Specifically, minor maintains "the trial court relied heavily on [minor's] gang involvement and the nature of the crimes to find [minor] was ineligible for juvenile treatment . . . ."  Minor complains, "The gravamen of the court's conclusions are that notwithstanding no real opportunity to rehabilitate [minor] within the statutory time framework and [minor's] recent behavior while in custody, including excelling in school, the crime itself justified transferring appellant to adult court."  We disagree.

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court.  It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.'  [Citation.]  The prosecution bears the burden of proving that the minor should be transferred.  [Citation.]" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164.)

"The Legislature amended section 707 in 2023 and 2024.  Effective January 1, 2023, Assembly Bill 2361 amended section 707[, subdivision] (a)(3) by adding the

following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court*. In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court*." [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

"The five statutory criteria listed in subparagraphs (A) through (E) of section 707[, subdivision] (a)(3) were not amended by Assembly Bill 2361. Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' [citation], (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation],[4] (3) '[t]he minor's previous delinquent history' [citation], (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' [citation], and (5) '[t]he

---

**4** "[T]he second criterion–'[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation] is distinct from the ultimate determination 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' [citation]." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167.)

circumstances and gravity of the offense alleged in the petition to have been committed by the minor' [citation]. The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

"Effective January 1, 2024, Senate Bill [No.] 545 amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. [Citation.] The previous version of the statute made consideration of those factors discretionary, not mandatory. [Citation.] With respect to the degree of criminal sophistication, Senate Bill [No.] 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking, sexual abuse, or sexual battery.' [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.) "[T]he express terms of section 707[, subdivision] (a)(3) require the court to evaluate [all] five criteria in determining whether 'the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' and that the statute does not require that any of those criteria be afforded any greater weight than any other. [Citation.]" (*Miguel R.*, at p. 167.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary

and capricious.' [Citation.]  The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence.  [Citation.]  In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings.  [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.]  Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard.  [Citation.]" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"[W]hile the circumstances of an offense are key to evaluating section 707's gravity criterion, they cannot be the sole basis for concluding under the rehabilitation criterion that the minor is unlikely to be rehabilitated before juvenile jurisdiction expires." (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 201.)

A.  Criminal Sophistication

The court found that minor "was an active member of the CGC Street Gang and was engaged in its violent lifestyle and criminal activities."  "His postings on Instagram and his recorded conversations from juvenile hall show a criminally sophisticated individual participating in gang activities, such as, rival gang graffiti removal, firearms procurement, and internal gang politics.  Because of his membership in the street gang, he

15

easily obtained the firearms. Postings on Instagram indicate he actively sold firearms. He illegally possessed and used in perpetration of the murder and attempted murder."

Minor "was engaged in furthering the interests of the street gang when he committed murder and attempted murder. He and his co-participant targeted the home in a rival gang's territory. By committing this drive-by shooting, the youth was seeking to elevate his status in the street gang. He demonstrated a high [degree] of sophistication in planning a drive-by shooting in a rival gang's territory and obtaining firearms for the drive-by shooting."

"The evidence shows that the youth has a high level of criminal sophistication. [¶] As for this criterion the evidence weighs against the youth being amenable to rehabilitation."

The court's exposition itself demonstrates substantial evidence supported its conclusion that this criterion weighed against minor's amenability to rehabilitation. Every reason cited by the court in making this determination is supported by evidence in the record.

Minor was a member of CGC and active in its violent criminal activities. He earned a new moniker due to his commission of violent crimes.

Minor's social media postings and recorded conversations from juvenile hall reflected that he participated in gang activities, such as rival gang graffiti removal, firearms procurement, firearms sales, and internal gang politics. Minor illegally possessed, sold, and ultimately used guns in perpetration of the murder and attempted murder. Three witnesses testified minor was criminally sophisticated. Thus, sufficient

16

evidence supported the court's finding that minor was not amenable to rehabilitation on this criterion.

B. Whether the Minor can be Rehabilitated by the Expiration of the Juvenile Court's Jurisdiction

The court noted that, "[a]lthough the youth has exhibited sporadic periods of good behavior while detained in juvenile hall, overall, his behavior has been mostly marginal to poor punctuated with acts of violence against peers. In recent months he has increased the frequency of his negative behavior. While at Juvenile Hall, the youth has demonstrated no intention of renouncing his gang membership as evidenced by his use of gang jargon, hand gestures, and gang-related writing."

Although minor had participated in several programs in juvenile hall, "[h]is participation has been inconsistent," "resulting in termination . . . due to disciplinary issues." "[D]espite the programming opportunities offered at juvenile hall and the youth's educational success, the youth has failed to show any progress in any rehabilitation or any desire to change his delinquent behavior." "As for this criterion, the evidence weighs against the youth being amenable to rehabilitation."

Again, the court's exposition demonstrates that substantial evidence supported its ruling. Minor committed numerous acts of disobedience and violence while incarcerated, including numerous "Code Reds." Minor drew pictures and made lists of guns; he made references to gangs and gang terminology in his writings.

Minor participated in, and even completed, multiple training and rehabilitative programs, yet continued to engage in poor behavior. Minor had been terminated from

17

several programs. Witnesses testified that minor had not implemented any of the skills he had been taught in the rehabilitative programs. Thus, sufficient evidence supported the court's finding that minor was not amenable to rehabilitation.

C. Minor's Previous Delinquent History

The court noted that "[o]n June 16, 2020, [minor] was arrested with other gang members in possession of a firearm that was used in the murder and attempted murder. He was charged with three counts of possessing a firearm as a felony and with street terrorism as a felony. [¶] On July 31, 2020, the youth admitted to violating Penal Code [section] 29610, a minor in possession of a firearm, a felony, and being placed on formal probation. [¶] On August 25, 2020, the youth was arrested for possession of a firearm. He was seen putting a handgun in his pocket and entering the Ontario Jewelry Mart. A 40-caliber handgun with two rounds in the magazine was found in his possession."

"The delinquency history which involved two felony possessions of a firearm cases and a robbery is similar to other youths' delinquency histories that was found suitable to remain under juvenile court jurisdiction. However, his history must be evaluated within the context and timing of the current offense. [¶] His participation in a robbery of a store approximately two months before the current murder and attempted murder shows a major escalation and seriousness of violence within a short period of time. [¶] After participating in the drive-by shooting, [minor] continued to associate with CGC street gang members and to possess firearms. The conduct after the shooting demonstrates a total lack of remorse and an intent to participate in the violent lifestyle of the CGC Street

18

Gang.  [¶]  As to this criterion, the Court finds the evidence is neutral as to the youth being amenable to rehabilitation."

The court's finding of neutrality on this criterion appears to be based on an interpretation that because minor's numerous offenses were committed over a very short period, it could not be held against him as much as if he had committed them over a longer period.  Substantial evidence supports the court's finding.

D.  Success of Previous Attempts at Rehabilitation

The court noted that, "[d]espite his participation in . . . programs in Juvenile Hall, [minor] continues to engage in frequent Code Reds involving physical assaults against his peers.  [Minor] continues to disrespect juvenile staff, refuses to obey staff directives and instructions.  Also, he continues to self-identify with the CGC Street Gang while in Juvenile Hall.  He shows no indication that he has any desire to remove himself from that lifestyle."  "Efforts to rehabilitate the youth while detained at juvenile hall has been unsuccessful.  As for this criterion the evidence weighs against the youth being amenable to rehabilitation."

Yet again, the court's exposition demonstrates substantial evidence supported its finding.  Again, minor participated in, and even completed, multiple training and rehabilitative programs, yet continued to engage in poor behavior.  Minor had been terminated from several programs.  Witnesses testified that minor had not implemented any of the skills he had been taught in the rehabilitative programs.

Minor continued to commit numerous acts of disobedience and violence while incarcerated, including numerous "Code Reds."  Minor drew pictures and made lists of

guns; he made references to gangs and gang terminology in his writings. Witnesses testified that minor showed no remorse. Thus, sufficient evidence supports the court's finding that previous attempts at rehabilitation had been unsuccessful.

E. Circumstances and Gravity of Offenses Listed in the Petition

The Court found that minor "actively and willingly participated in the drive-by shooting that resulted in the death of a teenage girl and serious injuries to her teenage cousin. [¶] The Court believes that the circumstances surrounding the murder and attempted murder were simply heinous in that the youth and co-part fired numerous times at the victims and party attendees that included adults and young children. The youth demonstrated a high level of callousness and disregard for human life during this incident. [¶] As to this criterion, the evidence weighs against the youth being amenable to rehabilitation."

The court's finding is supported by substantial evidence. The evidence reflected that 16-year-old K.E. was attending a birthday party for her two-year-old brother; she was standing at the front of the residence next to her cousin when she heard gunshots and fell to the ground. A witness reported that 16 gunshots had been fired from what appeared to be two shooters. K.E. "suffered a gunshot wound to the right upper leg which severed her femur." Her cousin, 14-year-old E.M., suffered a gunshot wound to the head and died. Sufficient evidence supported the court's finding that "the high level of callousness and disregard for human life" of the offense weighed against minor's amenability to rehabilitation.

20

F. Totality of Evidence

After making the prior findings, the court concluded that "based on all the foregoing reasons, after considering the [section] 707 transfer criteria, the Court finds that the People have met their burden of proof to show that [minor] is not amenable to rehabilitation under the jurisdiction of the juvenile court." The court's order was supported by substantial evidence and was within its discretion.

Here, in addition to the factors discussed *ante*, the court reviewed minor's personal history. The court noted, "No information was provided by the youth or his family to indicate that the youth suffered any traumatic events or adverse childhood experiences. Also, there's no information regarding learning disabilities or intellectual deficiencies. Overall, based on the evidence, there's nothing in the youth's personal history [which] appears to have been a material factor in affecting the youth's sophistication." The court noted that minor had "sporadic periods of good behavior while detained in juvenile hall, . . ." "The youth had demonstrated that he is intelligent and is able to be successful in an academic setting." Thus, the court did not simply focus on negative factors.

The court considered every mandatory factor, determined that four of them supported transfer to the criminal court, and that one was neutral. The court's discussion of the facts that supported transfer established sufficient evidence such that the court acted within its discretion in determining that minor was not amenable to rehabilitation within juvenile court jurisdiction.

Minor complains that he had "no opportunity to . . . receive probation services, . . ." However, minor was *offered* probation services; it was minor who chose to continue to

21

engage in an ever-escalating series of violent crimes while on probation, which resulted in revocation of those services. Nonetheless, as described *ante*, minor participated in, and even completed, multiple training and rehabilitative programs, yet continued to engage in poor behavior. Minor had been terminated for cause from several programs. Witnesses testified that minor had not implemented any of the skills he had been taught in the rehabilitative programs. Thus, it is not apparent how probation services would have benefitted minor.

Minor complains that the court "relied heavily on [minor's] gang involvement and the nature of the crimes to find [minor] was ineligible for juvenile treatment . . . ." Minor contends, "Here, the trial court attempted to balance the nature of the crime to the ability to rehabilitate [minor] in the time afforded by statute and relied upon generic sophistication criteria present in any homicide to find [minor] ineligible for treatment as a minor." We discern no improper focus on minor's crimes or gang involvement. Rather, the court carefully considered every required factor and balanced each prior to reaching its ruling.

## III.  DISPOSITION

We affirm the juvenile court's order granting the People's motion to transfer the matter to a court of criminal jurisdiction.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.